Dean C. Waldt (029475)
Michael A. DiGiacomo (032251)
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
waldtd@ballardspahr.com
digiacomom@ballardspahr.com
Telephone: 602.798.5400
Facsimile: 602.798.5595

*Counsel for U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, National Association, as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for the registered holders of Bear Stearns Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2005-PWR9, by and through its authorized special servicer, C-III Asset Management LLC, a Delaware limited liability company*

# UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>TUCSON ONE, LLC,<br><br>Debtor. | Chapter 11 Proceedings<br><br>Case No. 4:17-bk-11219-BMW<br><br>**OBJECTION OF U.S. BANK, AS TRUSTEE, TO DEBTOR'S DISCLOSURE STATEMENT DATED DECEMBER 21, 2017** |

U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, National Association, as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for the registered holders of Bear Stearns Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2005-PWR9, by and through its authorized special servicer, C-III Asset Management LLC, a Delaware limited liability company, in its capacity as special servicer (the "Lender"), respectfully submits this objection to the Disclosure Statement Dated December 21, 2017 (the "Disclosure Statement") [Dkt. No. 31] filed by the Tucson One, LLC ( the "Debtor"), in

the above-captioned chapter 11 case (the "Case"). This Objection is supported by the entire record in this Case and the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Lender's Interest in the Property

In 2005, Principal Commercial Funding, LLC made a loan (the "Loan") to Debtor in the original principal amount of $2,469,500.00. The Loan is evidenced by the Secured Promissory Note dated June 21, 2005 (the "Note"). Repayment of the Note is secured by various documents, including, but not limited to the liens, security interests, terms, and provisions contained within that certain Deed of Trust, Security Agreement and Assignment of Rents and Fixture Filing dated as of June 21, 2005 (the "Deed of Trust"), executed and delivered by Tucson One to the First American Title Insurance Company, as Trustee, for the benefit of Principal Commercial Funding, LLC.

The terms of the Note have been modified twice since its execution. Both modifications, first in December of 2010 and again in May of 2015, extended the term of the Note. The Note and Deed of Trust were assigned by Principal Commercial Funding, LLC to LaSalle Bank National Association, as Trustee for the registered holders of Bear Stearns Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2005-PWR9, and then ultimately assigned by Bank of America, National Association, as Trustee, as successor by merger to LaSalle Bank National Association, as Trustee, the registered holders of Bear Stearns Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2005-PWR9 to Lender. Lender is the current owner, holder, and beneficiary of and under the Loan, the Note, the Deed of Trust, and all other documents evidencing or securing the Loan (hereinafter referred to either individually or collectively as the "Loan Documents").

Debtor used the proceeds of the Loan to purchase real property more specifically described in the Deed of Trust, which is generally located at 3700 E. Ft. Lowell Road, Tucson, Arizona, 85716 (the "Property").

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

### B. Debtor's History

Debtor initially leased the Property to California Design Center, a furniture retailer. In 2011, California Design Center vacated the Property and Tucson One began leasing the Property to Circus Furniture, a discount furniture retailer. Circus Furniture filed a petition for relief under chapter 11 of the Bankruptcy Code on October 16, 2015. Circus Furniture, as part of its approved plan of reorganization, held a liquidation sale and vacated the Property on August 1, 2016. Since Circus Furniture vacated the Property, the Property has remained vacant and suffered from roof leaks, general neglect, break-ins, squatting, and vandalism.

Debtor has no current rental income. Indeed it has not had any rental or other income since August of 2016, at which time it was only receiving partial rent payments from Circus Furniture while Circus Furniture operated as a debtor-in-possession. *See* Disclosure Statement at 12-13.

### C. The Bankruptcy Case

Debtor commenced this Case by voluntarily petitioning the Bankruptcy Court for relief under the United States Bankruptcy Code (the "Bankruptcy Code") on September 22, 2017 (the "Petition Date"). The Disclosure Statement [Dkt. No. 31] was filed on behalf of the Debtor on December 21, 2017, and is related to the Debtor's Plan of Reorganization dated December 21, 2017 (the "Original Plan"). On April 18, 2017, after Lender filed its Motion for Relief from Stay as to the Property [Dkt. No. 49], Debtor filed its First Non-Adverse Modification of Plan of Reorganization Dated December 21, 2017 [Dkt. No. 50] (together with the Original Plan, the "Plan").

Lender's claim is designated as Class 4 in the Plan. The Plan treats the Class 4 claim as impaired. As to the Class 4 claim, the Plan provides that

> The Debtor's Plan proposes to limit the Class 4 Creditor's first position secured claim to $500,000, and to treat the balance of its claim, if any, as a second position secured claim against the Property to be paid upon the sale of the Property . . . .

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

The Debtor bases this treatment on its appraiser's valuation of the "Property at $500,000 as of April 2018." Plan, 2:3-4. Debtor provides no legal basis for its proposal to treat the unsecured balance of Lender's claim as a second position secured claim against the Property. This appears to be a transparent attempt to separately classify Lender's unsecured deficiency claim.

### D. The Property's Declining Value

Prior to the Petition Date, in May of 2017, Lender commissioned an appraisal by CBRE, Inc. (the "May 2017 Appraisal"). The appraised value of the Property as of May 3, 2017 was $1.3 million. Dkt. No. 48-4. As of the Petition Date, Debtor stated that the Property's value was $1.1 million. Dkt. No. 1 at. p. 5. Since the Petition Date, Debtor has failed to pay the real property taxes on the Property such that, as of January 3, 2018, $28,868.49 is due in delinquent real property taxes. Dkt. No. 41-5. Pursuant to an appraisal commissioned by Lender and conducted by CBRE in late 2017 (the "December 2017 Appraisal"), the value of the Property as of December 21, 2017 declined to $1.08 million dollars. *Id.* at 41-6. As of the Petition Date, the total payout amount due under the Loan Documents is $2,666,462.91. In the Plan and Disclosure Statement, Debtor asserts that the Property is worth only $500,000.

## II. LEGAL ARGUMENT

This Court should not approve the Disclosure Statement because, on its face, the Plan is incapable of confirmation. The approval of a disclosure statement is a two-step process. As a first step, courts should examine the terms of the plan and determine whether on its face it is so fatally flawed that confirmation would be impossible. *In re Silberkarus*, 253 B.R. 890, 899 (Bankr. C.D. Cal. 2000) ("[W]here a plan is on its face nonconfirmable, as a matter of law, it is appropriate for the court to deny approval of the disclosure statement describing the nonconfirmable plan."). This rule is based on considerations of judicial economy and a desire to reduce the burden on the estate, because no purpose is served by approving a disclosure statement describing a plan that cannot, as a matter of law, be confirmed. *In re Pecht*, 57 B.R. 137, 139 (Bankr. E.D. Va.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

1986) ("If, on the face of the plan, the plan could not be confirmed, then the Court will not subject the estate to the expense of soliciting votes and seeking confirmation."); *see also In re Arnol*, 471 B.R. 578, 586 (Bankr. C.D. Cal. 2012) (denying approval of disclosure statement because the plan was facially unconfirmable).

The second step in the analysis, after a determination that the plan is facially capable of confirmation, involves the consideration of whether the disclosure statement provides creditors and other parties-in-interest with "adequate information" about the terms of the plan such that it allows for both an informed vote and knowledgeable participation in the plan confirmation process. *See* 11 U.S.C. § 1125(a)(1); *Huntington Banks of Mich. v. Velcor/LAX Hldg. LP*, 9 Fed. Appx. 669, 670 (9th Cir. 2001) (citations omitted).

### A. The Disclosure Statement Should Not Be Approved Because The Plan Cannot be Confirmed.

"It is now well accepted that a court may disapprove of a disclosure statement, even when it provides adequate information about a proposed plan, if the plan could not possibly be confirmed." *In re Main St. AC Inc.*, 234 B.R. 771, 775 (N.D. Cal. 1999). *See e.g.*, *In re Allied Gaming Mgmt. Inc.*, 209 B.R. 201, 202 (Bankr. W.D. La. 1997) ("a disclosure statement should not be approved if the proposed plan as a matter of law, cannot be confirmed"); *In re Curtis Ctr. Ltd. P'Ship*, 195 B.R. 631, 638 (Bankr. E.D. Pa. 1996) ("Court notes its agreement with the proposition that a disclosure statement should be disapproved where the plan it describes is patently unconfirmable"). "Additionally, a court may deny approval of a disclosure statement even if it is not by itself deficient if a debtor's plan has no hope of being confirmed." *In re Forest Grove, LLC*, 448 B.R. 729, 736 (Bankr. D. S.C. 2011) (citing *In re Bermuda Bay, L.L.C.,* Nos. 09-32133, 09-32130, 2009 WL 5218071 at *3 (Bankr. E.D. Va. Dec. 31, 2009)). In this case, Debtor has proposed a Plan that is patently unconfirmable. Furthermore, even if the Plan was legally capable of being confirmed apart from Section 1129(b), it has no realistic hope of obtaining the votes necessary for confirmation over the negative vote of Lender.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

### 1. The Plan Does Not Provide For An Impaired Accepting Class In Violation of 11 U.S.C. § 1129(a)(10).

The Plan fails to meet the requirements of § 1129(a)(10) because it does not provide for an impaired accepting class of creditors. Under § 1129(a)(10), "[i]f a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider."

The only creditors to file proofs of claim in this case are Lender and Pima County. *See* Claim Nos. 1-1 and 2-1. Scheduled non-insider unsecured claims total $41,800. That amount is dwarfed by Lender's unsecured deficiency claim such that a properly configured class of unsecured creditors cannot accept the Plan under § 1126(c).

Pima County, pursuant to the Plan, is to be paid in full "consistent with the provisions of 11 U.S.C. § 1129(a)(9)(C)(ii) and (D)." Plan, 13:26-14:2. Although Debtor's Plan alleges that Pima County's claim is impaired, the Debtor is incorrect. *See In re Val-Mid Assocs., LLC*, No. 4:12-bk-20519-JMM 2013 Bankr. Lexis 97 at *5 (Bank. D. Ariz. Jan. 9, 2013) (case law holds "that a tax claimant, whether secured or unsecured priority, is not an impaired class that can accept a plan and bind other truly impaired creditors to a cram down) *citing In re Bryson Props., XVIII*, 961 F.2d 496, 501 n.8 (4th Cir. 1992) ("priority tax claimants, which receive preferential treatment under the Code (*see* 11 U.S.C. § 1129(a)(9)(C)), are not an impaired class that can accept a plan and bind other truly impaired creditors to a cram down."). Debtor's treatment of Pima County's claim leaves the claim unimpaired.

Although classified otherwise in the Plan, Lender's deficiency claim is unsecured and should be listed as such in the Plan. Debtor provides no authority for its effort to eliminate Lender's unsecured deficiency claim by giving Lender a junior claim "secured" by the Property, without any value to actually secure it. This is a blatant attempt to disenfranchise Lender of its deficiency claim, which, if properly classified, would leave

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

Lender in control of the unsecured creditor class and allow Lender to block Debtor's efforts to cram down Lender's claim.

Lender affirmatively states that if its deficiency claim were properly classified as an impaired unsecured claim, it would vote against the Plan. Based on this fact alone, the Plan is patently unconfirmable and the Disclosure Statement should not be approved.

### 2. The Modified Plan Fails To Comply With 11 U.S.C. § 1129(a)(7)'s Best-Interest-Of-Creditors Test.

Section 1129(a)(7) requires that, for a given class of claims, each holder of a claim or interest in such class must either (i) accept the plan or (ii) "receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain" in a hypothetical chapter 7 liquidation (i.e., a creditor must get at least what it would get in a chapter 7 liquidation, with interest on any payment stream). The Plan does not meet the "best-interest test."

Debtor must ensure that Lender receives at least what it would be entitled to in a chapter 7, with appropriate interest on any proposed payment stream. But, the Plan fails to do this. First, the Plan ignores the fact that Debtor's sole asset, the Property, is declining in value. Since filing this case, Debtor has amended its value of the Property from $1.1 million on the Petition Date [Dkt. No. 1 at p. 5] to $500,000 as of April 2018 [Dkt. No. 50 at p. 2]. An admitted decrease in value of more than 50% in less than a year demonstrates the basic fact that the Property is steadily decreasing in value and Debtor has not done, and refuses to do, anything to attempt to stabilize that value. Even assuming the rate of decline is exaggerated by Debtor for litigation purposes, it is evident that the liquidation of the Property now before further neglect increases the decline in value is in the best interest of creditors.

Furthermore, in the Plan, Debtor proposes to pay Lender's secured claim in the amount of $500,000 amortized over 30 years at 3.5% interest and to make interest only payments on that amount for up to ten years. But, Debtor has no way to pay that amount.

Debtor has no cash flow to pay debt service, no cash flow to pay taxes as they come due—post-petition taxes are already more than $28,000 in arrears—and no cash to stabilize or maintain the Property. Thus, the proposed treatment of Lender, to the extent it even meets the best-interest-of-creditors test, is not something which Debtor can actually even perform.

### 3. The Plan Is Not Feasible, Failing To Comply with 11 U.S.C. § 1129(a)(11).

Section 1129(a)(11) provides, in pertinent part, that a plan cannot be confirmed unless confirmation "is not likely to be followed by liquidation, or the need for further financial reorganization of the debtor unless such liquidation or reorganization is proposed by the plan." Courts interpreting section 1129(a)(11) of the Bankruptcy Code focus on the feasibility of the plan. Feasibility typically involves the question of the emergence of a reorganized debtor in a solvent condition and with reasonable prospects of financial stability and success. *See e.g.*, *Matter of King Resources Co.*, 651 F.2d 1326, 1340 (10th Cir. 1980); *In re Confederation Life Ins. Co.*, 126 B.R. 632, 636 (N.D. Ga. 1991). A debtor must establish that its plan is feasible based upon concrete and reliable data. *In re Ritz-Carlton of D.C., Inc.*, 98 B.R. 170, 172 (S.D.N.Y. 1989). Under the feasibility requirement, a debtor must demonstrate that the plan "has a reasonable probability of success." *Acequia, Inc. v. Clinton (In re Acequia)*, 787 F.2d 1352, 1364 (9th Cir. 1986). "'The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'" *Pizza of Hawaii, Inc. v. Shakey's Inc. (In re Pizza of Hawaii, Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) citing 5 *Collier on Bankruptcy* ¶ 1129.02[11] at 1129–34 (15th ed. 1984).

Here, the Plan is not feasible. Beyond Debtor's bald assumption that it will obtain a tenant capable of paying rent sufficient to allow Debtor to service its debts, the Plan also assumes that a prospective tenant will pay rent sufficient to allow Debtor to cure unpaid taxes, pay future real property taxes as they become due, and update and repair

the Property to a condition sufficient for a potential tenant to occupy the Property. It further assumes that such a tenant will enter a lease and begin paying rent in the short term.

Beyond the unsupported affidavit of Debtor's real estate broker accompanying Debtor's response in opposition to Lenders stay relief motion [Dkt. No. 52], there is no support for the allegation that a new tenant or a sufficiently robust lease are in prospect, or even on the horizon. If the past 18 months are any indication, it appears highly unlikely that Debtor will be able to secure a tenant for the Property, especially considering the Property's current state of disrepair.

Debtor attempts to avoid the feasibility argument by stating that its principal will make all necessary contributions of capital to effectuate the Plan. However, there is no indication of how much will be contributed or when, and there is no obligation on the part of the principal to contribute any amounts to Debtor. Debtor's plan is based on pure speculation and amounts to a "hope certificate plan," which is in clear opposition to the requirements of § 1129(a)(11).

### 4. The Plan Is Neither Fair Nor Equitable On Its Face, Failing to Comply with 11 U.S.C. § 1129(b)(2).

Section 1129(b)(2) requires that a plan be fair and equitable. To be "fair and equitable" regarding secured creditors, the Plan must comply with § 1129(b)(2)(A)(i)–(iii) by allowing Lender to (a) retain its liens on its collateral in an amount equal to the allowed amount of its claim; and (b) receive cash payments that have a value equal to Lender's interest in the estate's interest in the Property as of the Effective Date of the plan (i.e., present value). 11 U.S.C. § 1129(b)(2)(A)(i).

To give a creditor the present value of its allowed claim, deferred cash payments must be valued as of the effective date of the plan, and must "consist of an appropriate interest rate and an amortization of the principal which constitutes the secured claim." *In re VDG Chicken, LLC*, 2011 WL 3299089, at *7 (B.A.P. 9th Cir. 2011).

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

To determine an appropriate interest rate, courts in the Ninth Circuit have used, the "formula approach" that starts with a standard measure of risk-free lending, such as the Wall Street Journal Prime Rate, and adds an upward adjustment based on the debtor, the plan, and the security for the loan. *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004); *Farm Credit Bank v. Fowler (In re Fowler)*, 903 F.2d 694, 697–99 (9th Cir. 1990).

Here, the Plan proposes to pay Lender $500,000, the alleged value of the Property, at an interest rate of 3.5%, amortized over 30 years, with interest only payments for, potentially, the first 10 years. Such treatment is not "fair and equitable" as a matter of law.

The proposed interest rate in the Plan does not reflect the risk factors inherent and, thus, does not include the necessary upward adjustment required by *Till*. *See Till*, 541 U.S. at 479 (the appropriate interest rate to yield present value should be determined by adjusting the prime rate by risk factors).

The prime rate as of May 2018 is 4.75%. *See* Wall Street Journal Prime Rate, *located at* http://www.bankrate.com/rates/interest-rates/wall-street-prime-rate.aspx (last visited on May 11, 2018). A decrease of 1.25% from the prime rate represents a negative adjustment, creating a restructured sub-prime loan disfavoring the Lender. Regardless of the risk, until a *Till* analysis, Debtor must pay at least the prime rate, which is then subject to an upward adjustment based on risk factors. Given the risks inherent in the Plan, which is based on a long-vacant, long-neglected deteriorating asset without a tenant owned by an entity without capital, it is clear that a substantial upward adjustment in rate would be required.

Adding insult to injury, Debtor then proposes to conduct an appraisal after five years of interest-only payments on its restructured sub-prime loan and then, *assuming Lender is still under secured*, extend the interest-only payment structure for another five years to increase the negatively amortized maturity payment that cannot possibly be covered by any realistic estimate of appreciated collateral value.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

In short, Debtor has proposed a Plan in which a further decline in the value of collateral will not create an event of default but, to the contrary, extend the maturity date of the restructured sub-prime loan and increase the growing negatively amortized amount due at maturity. This is real estate finance turned upside-down and is completely antithetical to the requirement that the Plan be fair and equitable.

### 5. The Plan Allows Old Equity To Retain Its Interest In Debtor In Violation of 11 U.S.C. § 1129(b)(2)(B).

On its face, the Plan also violates the absolute-priority rule of § 1129(b)(2)(B)(ii) because Debtor's creditors will not be paid in full and a junior class (*i.e.*, existing equity) will retain *all* of its membership interest in the reorganized Debtor.

The Ninth Circuit recognizes an exception to the absolute-priority rule, only when and if the junior claims holders contribute new capital and money. *See In re Bonner Mall P'ship*, 2 F.3d 899, 910–16 (9th Cir. 1993). This exception is referred to as the "new value exception." In order for old equity holders to retain their interests in the debtor, courts require that the capital contribution be (a) new; (b) substantial; (c) made in money or money's worth; (d) necessary for a successful reorganization; (e) reasonably equivalent to the value or interest being received; and (f) open to valuation by the market. *See, e.g., In re Suncruz Casinos, LLC,* 298 B.R. 833, 841 n.4 (Bankr. S.D. Fla. 2003).

In this case, the Plan attempts to overcome the absolute priority rule by proposing that its "Principal's new capital contributions" will be used to implement the Plan. However, this provides no actual information about the amount or value Debtor's principal will contribute. There is no way to tell if the contributions will be new or substantial. There is also no information as to when or how Debtor's principal will contribute value. Amazingly, the latest iteration of the Plan also releases Debtor's principal from his personal guaranty obligations with respect to the Loan, as to which the principal is presently a defendant in an action pending in the State of California.

In sum, the Plan allows for Debtor's principal to retain all equity it holds in the reorganized Debtor in exchange for contributing some unknown amount of money but

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, AZ 85004-2555

only if rent received from an unknown future tenant is insufficient to fund the cram-down Plan.

As drafted, the Plan presents an unsolvable legal paradox. If the Plan is financially feasible, Debtor's principal will contribute nothing and the absolute priority rule will be violated. If the Plan is not financially feasible, Debtor's principal will be asking the Court to allow him to pay his guarantee obligations through the chapter 11 plan of an entity that cannot meet the basic statutory requirements for confirmation in the first place and get a free release of the guaranty in the bargain.

This is completely insufficient for purposes of the new value exception and is just another example of the fact that confirmation of the Plan is a legal impossibility.

## III. <u>CONCLUSION</u>

Based on the foregoing, Lender respectfully requests Debtor's request that the Court approve the Disclosure Statement be denied.

RESPECTFULLY SUBMITTED this 15th day of May, 2018.

        BALLARD SPAHR LLP

        By: */s/ Michael A. DiGiacomo*
           Dean C. Waldt
           Michael A. DiGiacomo
           1 East Washington Street, Suite 2300
           Phoenix, AZ 85004-2555

*Counsel for U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, National Association, as Trustee, successor by merger to LaSalle Bank National Association, as Trustee for the registered holders of Bear Stearns Commercial Mortgage Securities, Inc., Commercial Mortgage Pass-Through Certificates, Series 2005-PWR9, by and through its authorized special servicer, C-III Asset Management LLC, a Delaware limited liability company*

| | |
|---|---|
| 1 | COPY of the foregoing electronically filed |
| 2 | and transmitted via CM/ECF this same date to all parties requesting notice in this case. |
| 3 | |
| 4 | By: */s/ Tasha Hart* |